JS - 6

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

TANYA MONDOLO,                )    Case No. CV 11-7435 CAS(MRWx)
                              )
            Plaintiff,        )
                              )    **FINDINGS OF FACT AND**
vs.                           )    **CONCLUSIONS OF LAW**
                              )
                              )
UNUM LIFE INSURANCE COMPANY   )
OF AMERICA,                   )
                              )
                              )
            Defendant.        )
_____  )

## I.   INTRODUCTION

Plaintiff Tanya Mondolo filed the instant action in this Court on September 9, 2011.  Plaintiff's complaint alleges that defendant Unum Life Insurance Company of America ("Unum") wrongfully denied disability insurance benefits.  Plaintiff's complaint alleges a single claim for relief under the Employee Retirement Income Security Act, 29 U.S.C. § 1132 ("ERISA").  The relief plaintiff seeks is payment of disability benefits, a judgment clarifying plaintiff's rights to future disability benefits, and attorneys' fees and costs.

The parties filed opening trial briefs on November 13, 2012, and filed responsive trial briefs on November 27, 2012.  Additionally, the parties submitted proposed

1  findings of fact and conclusions of law on December 4, 2012.  A court trial was held on

2  December 12, 2012, and the case was taken under submission at the conclusion of the

3  trial.  After considering the parties arguments, the Court finds and concludes as follows.

4  **II.    FINDINGS OF FACT**

5        **A.    The Parties**

6        1.        Plaintiff Tanya Mondolo was diagnosed with Acute Lymphocytic Leukemia

7  in November 1998.  (248).[1]  After undergoing chemotherapy for several years, her

8  cancer went into remission, and she received an AA degree and returned to the

9  workforce in 2004.  (792, 483 – 484).

10        2.        Plaintiff also suffers from depression.  (72).  Between 2006 and 2010, she

11  attempted to have children and start a family.  Unfortunately, each of the four times she

12  became pregnant she experienced a miscarriage in the third trimester.  (223, 727).  Her

13  fourth miscarriage, which took place in December 2009, required surgery.

14        3.        As of January 2011, plaintiff has also been diagnosed with avascular

15  necrosis ("AVN") and fibromyaglia ("FMS"), and suffers from bone infarct (bone death)

16  within her femurs, tibias, and left elbow.  (708, 737, 745).  Plaintiff's physician believes

17  that the bone death is a result of her chemotherapy regimen to treat her leukemia.  (708).

18  Plaintiff has difficulty walking.  (708).

19        4.        Defendant Unum is an insurance company.  Unum insured the long term

20  disability plan ("the LTD Plan") maintained by plaintiff's former employer, Jacobs

21  Engineering.  Unum insured the LTD Plan pursuant to Policy 578208001 ("the Policy").

22  (133 – 173), and also acts as the claims administrator under the LTD Plan.

23  / / /

24  / / /

25  / / /

26

27        [1] All numerical citations refer to pages of the administrative record, dkt nos. 46 – 48.

28

1

**B.    Plaintiff's First Claim for Disability Benefits**

2

5.    In 2005, plaintiff began working for Jacobs Engineering as a procurement

3

clerk.  Plaintiffs job duties involved clerical and administrative work.  (178 – 180, 485,

4

772).

5

6.    On July 20, 2009, plaintiff's psychological treatment provider

6

recommended that she stop attending work due to postpartum depression caused by

7

plaintiff's miscarriages, anxiety, and stress.  (72 – 73).

8

7.    Suffering from this depression, plaintiff stopped attending work in July

9

2009.  Additionally, she filed a disability claim under the Policy, based primarily on her

10

mental health difficulties.  (79).

11

**C.    Unum's Disability Benefits Policy**

12

8.    The Policy grants Unum discretionary authority to determine a claimant's

13

eligibility for benefits and interpret the provisions of the policy.  (144, 170).

14

9.    Policy benefits are distributed after a 180-day elimination period.  (137).

15

10.    The Policy defines disability as:

16

"You are 'totally disabled' during any period covering a disability for

17

your occupation, own occupation, normal occupation, regular

18

occupation or usual occupation when a disability renders you unable

19

to perform with reasonable continuity the substantial and material

20

acts necessary to pursue your usual occupation in the usual and

21

customary way.

22

"During any period covering a disability from any occupation,

23

any other occupation, any gainful occupation, any other gainful

24

occupation, reasonable occupation or another occupation when a

25

disability renders you unable to perform with reasonable continuity

26

the substantial and material acts necessary to pursue your usual

27

occupation in the usual and customary way and unable to engage

28

with reasonable continuity in another occupation in which you could reasonably be expected to perform satisfactorily in light of your age, education, training, experience, station in life, physical and mental capacity.

'Substantial and material acts' as used in the above definition of disability means acts that

-are normally required for the performance of your usual occupation or another occupation, and

-cannot be reasonably omitted or modified." (134).

11.     The Policy provides for a maximum of 12 months of benefits for a disability that prevents a claimant from performing his or her own occupation ("own occupation period"). (148).

12.     After 12 months of benefits, the Policy requires the insured to be disabled from any gainful occupation on a part-time basis to receive further benefits. The Policy defines "gainful occupation" to mean "an occupation that is or can be expected to provide you with an income at least equal to 60% of your indexed monthly earnings within 12 months of your return to work." (134, 154, 161 – 163).

13.     The Policy also limits benefits for disabilities primarily due to mental illness to a maximum of 12 months ("MIL"). "Mental Illness means a psychiatric or psychological condition regardless of cause such as schizophrenia, depression, manic depressive or bipolar illness, anxiety, personality disorders and/or adjustment disorders or other conditions. These conditions are usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment." (154, 162).

14.     Policy payments stop, in relevant part, "after 12 months of payments, when you are able to work in any gainful occupation on a part-time basis but you choose not

/ / /

1  to," and also stop on "the date you are no longer disabled under the terms of the plan."

2  (154).

3        **D.     Unum's Discovery of Plaintiff's Potential Physical Disability**.

4       15.     Pursuant to the terms of the Policy, Unum approved plaintiff's disability

5  claim arising from her depression, and began paying benefits on February 5, 2010.  (237

6  – 241).

7       16.     Unum also conducted a claim investigation, during which it contacted Dr.

8  Sandhya Gudapati, a psychiatrist treating plaintiff, and Dr. Gaius Steiner, a pscyhologist

9  treating plaintiff.  In response to Unum's inquiries, Dr. Gudapati explained that

10  plaintiff's mental health problems were caused by physical health issues, and Dr. Steiner

11  noted that plaintiff was "fragile and frail."  (596, 606).  Both physicians also stated that

12  plaintiff continued to suffer from depression.

13       17.     Between October 2010 and December 2010, in-house Unum physicians

14  reviewed plaintiff's file and communicated with Dr. Steiner and Dr. Gudapati.  Based on

15  their review, the Unum physicians concluded that plaintiff's mental health difficulties no

16  longer precluded her from working in her occupation.  (614 – 617, 558 – 559, 596 –

17  610).

18       18.     However, Unum's physicians observed that plaintiff's "physical problems

19  may outweigh her psychiatric problems."  (616).  Consequently, Unum determined that

20  it should conduct a general medical review to determine whether plaintiff suffered from

21  a physical disability.  (614 – 617).

22        **E.     Plaintiff's AVN and FMS Diagnosis**

23       19.     Pursuant to its claims investigation, Unum wrote to plaintiff on December

24  2, 2010, stating that it was "no longer approving further disability benefits due to your

25  psychiatric conditions."  (627).  Additionally, Unum asked plaintiff to have her

26  physician certify her physical impairment if she was unable to work due to physical

27  health conditions.  (627).

28

1
2
3

20.     After a series of referrals, plaintiff was sent to Dr. Elizabeth Ortiz, an Assistant Professor and Rheumatologist at the University of Southern California, regarding her physical health.  (674, 716, 729).

4
5
6
7
8
9
10
11

21.     Dr. Ortiz first saw plaintiff on January 18, 2011.  During this visit, plaintiff described her symptoms as "pain in my joints, swelling, slow movement, popping, limited movement."  The pain was in her wrists, elbows, neck, right shoulder, back, knees, and ankles.  (716).  She was experiencing fatigue, weakness, tenderness, headaches, difficulty sleeping, anxiety, and depression.  (717).  Dr. Ortiz' notes from this visit observe that plaintiff's pain had been getting progressively worse for two years, and had become especially severe in recent months.  Dr. Ortiz' notes also state that plaintiff's pain was not being controlled by various pain medications.  (713).

12
13
14
15
16
17
18
19

22.     Dr. Ortiz saw plaintiff again on January 25, 2011.  During this visit, Dr. Ortiz reviewed x-rays and other lab results with plaintiff.  Plaintiff's x-rays and MRIs show that plaintiff was suffering from bone death in both of her femurs and tibias, and that there was evidence that plaintiff's left elbow had suffered from a mild collapse. (708).  Dr. Ortiz believed that the bone death was likely the result of plaintiff's cancer treatment.  Dr. Ortiz felt that Ms. Mondolo's persistent bone and joint pain was multi-factorial, including components of AVN and FMS.  Lyrica was started to treat the FMS, and Flector patches with Percocet (an opioid) were continued for pain.  (710).

20
21
22
23
24
25
26
27

23.     Also on January 25, 2011, Dr. Ortiz completed Unum's attending physician's statement form ("APS").  In completing the form, Dr. Ortiz listed the primary diagnosis as AVN and the secondary diagnosis as FMS. Dr. Ortiz set out restrictions and limitations ("R&Ls") regarding plaintiff's  functional capacity via checked boxes listed on the form.  The boxes Dr. Ortiz checked indicated Ms. Mondolo was able to sit "frequently" (34 – 66 % of the time), and "occasionally" (1 – 33 % of the time) stand, walk, perform fine finger movements, push/pull, reach above the shoulder, / / /

28

1    and lift/carry up to 10 lbs.  (737, 745).  Dr. Ortiz did not expect that plaintiff would show

2    enough improvement to return to work for at least a year.  (738).

3         24.    Unum accepted the R&Ls Dr. Ortiz' submitted on January 25, 2011, and

4    has never contested their accuracy.  Based on these R&Ls, Unum conducted a vocational

5    review and concluded that plaintiff was unable to perform her own occupation.  (20, 22,

6    750, 770 – 773).  Specifically, Unum's vocational reviewer determined that plaintiff was

7    unable to perform the fine finger movements her own occupation required.  (773).

8         **F.    Unum's Vocational Review Determined that Plaintiff was Able to**

9              **Work and Denied Plaintiff Additional Benefits**

10        25.    At the end of January 2011, the Policy's 12-month "own occupation"

11   period ended.  Consequently, to determine whether plaintiff still qualified for disability

12   benefits under the Policy, it was necessary for Unum to determine whether plaintiff

13   could work in occupations other than her own.

14        26.    Unum sent plaintiff's file to one of its vocational review consultants

15   ("VRC") to determine whether plaintiff was capable of working under the constraints of

16   the R&Ls submitted by Dr. Ortiz.  (750).  The VRC concluded that, given plaintiff's

17   skills and R&Ls, plaintiff was capable of working as an adjustment clerk, banking loan

18   interviewer, and credit authorizer (the "alternative occupations").  (754).

19        27.    The vocational review did not obtain the fingering requirements for these

20   three alternative occupations.  (750 – 755).  Additionally, although the VRC's report sets

21   out almost all of Dr. Ortiz' January 21, 2011 R&Ls, the VRC did not acknowledge the

22   sitting limitation that Dr. Ortiz submitted with her R&Ls.  (751).

23        28.    Relying on the review, Unum terminated plaintiff's disability benefits on

24   March 17, 2011.  Unum's termination letter did not acknowledge plaintiff's sitting

25   limitation, and claimed that plaintiff could work as a banking loan interviewer, credit

26   authorizer, or adjustment clerk within her R&Ls.  (762 – 769).

27

28

1

**G.    Plaintiff Appealed her Denial of Benefits**

2

29.    On April 28, 2011, plaintiff contested Unum's denial of benefits within

3

Unum's appeals department.  (789).  In support of her appeal, plaintiff submitted letters

4

from Dr. Ortiz and Dr. Steiner, and also submitted updated medical records from Dr.

5

Ortiz.  (791 – 793, 840 – 878).  Dr. Ortiz' notes reflect that plaintiff was taking several

6

medications to manage her pain and other symptoms, and states that plaintiff's pain at

7

times prevented her from walking.  (850 – 851).

8

30.    On May 16, 2011, Dr. Ortiz completed a second APS form containing

9

updated R&Ls.  (894).  Dr. Ortiz explained that plaintiff was experiencing extreme

10

difficulty walking, sitting, and standing.  (See also 792 – 793, 802, 893 – 897, 900).

11

31.    To evaluate plaintiff's appeal, Unum obtained a paper review of plaintiff's

12

case from Dr. Thomas Moses, an orthopedic surgeon and one of Unum's in-house

13

physicians.  (901 – 907, 923 – 924, 933 – 939, 948).  Dr. Moses disagreed with Dr.

14

Ortiz' increased R&Ls and her diagnosis of Fibromyalgia (905 – 906), and called Dr.

15

Ortiz to discuss plaintiff's claim.  (907).  After communicating with Dr. Ortiz, Dr. Moses

16

concluded that her updated R&Ls were inaccurate, and submitted his own set of R&Ls.

17

(912 – 914, 919 – 920, 923 – 924, 934 – 936, 938 – 939).  Dr. Moses noted that he did,

18

however, "basically" agree with Dr. Ortiz' January 25, 2011 R&Ls.  (913).

19

32.    Based on the disagreement between Dr. Ortiz and Dr. Moses, Unum

20

requested that Dr. Susan Benson, an in-house Unum physician who specializes in pain

21

management and rehabilitation, conduct a paper review of plaintiff's case.  After

22

reviewing plaintiff's file, Dr. Benson agreed with Dr. Moses' R&Ls, and concluded that

23

further medical review was unnecessary.  (938 – 939, 943 – 947).

24

33.    Utilizing the R&Ls provided by Dr. Moses, Unum's appeal VRC conducted

25

a vocational review to determine whether plaintiff could perform her own occupation or

26

any of the three alternative occupations.  (950 – 952, 954, 773).  This review did not

27

consider the sitting and fingering limitations contained in Dr. Ortiz' initial R&Ls.

28

1

34.     On July 6, 2011, Unum sent plaintiff a letter that upheld its denial of

2     benefits.  (954).

3

35.     To the extent necessary, each of these findings of fact may be deemed to be

4     a conclusion of law.

5     **III.   CONCLUSIONS OF LAW**

6          **A.       Applicable Standard of Review**

7

1.       Where, as here, an ERISA plan grants an administrator discretionary

8     authority to determine a claimant's eligibility for benefits, courts review a denial of

9     benefits for abuse of discretion.  Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101,

10    111, 115 (1989).  Under this deferential standard, a plan administrator's decision should

11    be upheld if it is reasonable, but overruled if it is illogical, implausible, or unsupported

12    by inferences that can be drawn by facts in the record.  Stephan v. Unum Life Ins. Co. of

13    America, 697 F.3d 917, 929 (9th Cir. 2012).

14

2.       However, the nature of this abuse of discretion review changes slightly

15    when the plan administrator has a structural conflict of interest due to the fact that it both

16    pays benefits under a plan and determines whether a claimant is eligible for benefits.

17    Firestone Tire, 489 U.S. at 115.

18

3.       In MetLife v. Glenn, 554 U.S. 105 (2008), the Supreme Court explained

19    that the existence of a conflict of interest should be "weighed as a factor in determining

20    whether there is an abuse of discretion," and that the significance of a conflict of interest

21    varies from case to case.  MetLife, 554 U.S. at 115, 117.

22

4.       Applying MetLife, the Ninth Circuit explained that if the facts and

23    circumstances in a particular case indicate that a conflict of interest may have "tainted

24    the entire administrative decisionmaking process," then a reviewing court should review

25    the articulated basis for a denial of benefits with "enhanced skepticism."  Montour v.

26    / / /

27

28

Hartford Life & Acc. Ins. Co., 588 F.3d 623, 631 (9th Cir. 2009) (following Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 969 (9th Cir. 2006)).[2]

5.     The Ninth Circuit has highlighted several factors that can demonstrate a structural conflict significant enough to warrant enhanced skepticism.  These factors include offering inconsistent reasons for denying benefits, failing to adequately investigate a claim, and deciding to conduct a "pure paper" review instead of an in person review where there is reason to believe that the paper-reviewing physician did not receive all relevant evidence.  See Saffon v. Wells Fargo, 522 F.3d 863, 868 (9th Cir. 2008); Montour, 588 F.3d at 635.  Additionally, irrational decisionmaking or illogical reasoning can also support an inference of bias.  Stephan v. Unum Life Ins. Co. of America, 698 F.3d at 934 – 939.  Finally, the Supreme Court has explained that a "conflict of interest . . . should prove more important (perhaps of great importance) . . . where an insurance company administrator has a history of biased claims administration."  MetLife, 554 U.S. at 117.

6.     Conversely, the Supreme Court has delineated circumstances in which a structural conflict of interest should be deemed relatively unimportant.  In MetLife, the Court explained that a conflict is less relevant where "the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interest in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits."  MetLife, 489 U.S. at 117.

---

[2] Nonetheless, the Ninth Circuit in Montour made clear that the standard of review itself does not shift in proportion to the seriousness of a conflict of interest, but instead explained that reviewing an administrator's stated basis for a decision with enhanced skepticism is "functionally equivalent to assigning greater weight to the conflict of interest as a factor in the overall analysis of whether an abuse of discretion occurred."  Montour, 588 F.3d at 631.

1

**B.     Factors Warranting Enhanced Skepticism are Present in this Case**

2      7.      Because Unum both pays benefits claims and determines whether claimants

3  qualify for benefits, Unum has a structural conflict of interest.

4      8.      Several factors are present in this case suggesting that this structural

5  conflict of interest should cause the Court to review Unum's decision with enhanced

6  skepticism.

7      9.      First, there is evidence that Unum failed to adequately investigate plaintiff's

8  claim.  As explained in more detail below, Unum failed to determine how much sitting

9  plaintiff could tolerate without suffering significant pain, nor did it investigate whether

10  the alternative jobs it found appropriate for plaintiff involved fingering requirements

11  within plaintiff's capacity.  (Conclusions of Law, ¶¶ 14 – 17, infra).

12      10.      Second, Unum's physicians conducted a "pure paper" review as part of its

13  internal appeals process, and as explained in more detail below, it appears that the paper

14  review physicians did not consider relevant evidence about plaintiff's mental health due

15  to Unum's unreasonable interpretation of the Policy.  (Conclusions of Law, ¶¶ 23 – 26,

16  infra).  The failure to consider this relevant evidence provides an additional reason to

17  apply enhanced skepticism.  Montour, 588 F.3d at 634.

18      11.      Third, as the Ninth Circuit has recently affirmed, Unum has a history of

19  biased claims administration.  Stephan, 697 F.3d at 934.  This history provides a reason

20  to assign greater weight to the conflict of interest.  MetLife, 554 U.S. at 117.

21      12.      Unum argues that it has taken steps to prevent its structural conflict of

22  interest from skewing its decisionmaking.  In support of this argument, Unum submitted

23  a declaration from Stephanie LeSieur – the Unum officer who oversaw plaintiff's appeal

24  – stating factors that purport to show the impartiality of Unum's appellate process.

25  LeSieur explains that she was never discouraged from allowing legitimate claims to be

26  paid, that her compensation does not depend on the number of claim denials she

27  upholds, that she does not consider the financial impact of her decisions on Unum, and

28

1   generally states that she conducts the appellate process fairly.  LeSieur Decl. ¶¶ 8 – 10,

2   18, 19.  Additionally, she states that financial personnel do not communicate with or

3   advise Unum's appeals unit, that the appeals unit has no role in managing or reporting

4   Unum's finances, and that Unum's appeals unit is "completely separate" from its finance

5   department.  LeSieur Decl. ¶¶ 16 – 18.

6          13.      The Court finds that LeSieur's declaration does not set out compelling

7   reasons to find that Unum's conflict of interest is unimportant.  First, LeSieur has not

8   described any "management checks that penalize inaccurate decisionmaking irrespective

9   of whom the inaccuracy benefits."  MetLife, 554 U.S. at 117.  Second, based on

10  LeSieur's declaration, it does not appear that Unum has "walled off" its claims

11  administrators from its financial personnel in the manner contemplated by the Supreme

12  Court in MetLife.  When the Supreme Court in MetLife observed that walling off claims

13  administrators from financial personnel could blunt the effects of a conflict of interest, it

14  cited to an article setting out the features of an effective "information wall."  See

15  MetLife, 554 U.S. at 118 (citing Herzel & Colling, The Chinese Wall and Conflict of

16  Interest in Banks, 34 Bus. Law 73 (1978)).  This article recommended several strategies

17  that should be used to construct an effective information wall, which included: (1) a

18  policy statement, (2) education programs, (3) restrictions on access to files, (4)

19  prohibitions on frequent transfers of personnel between units, (5) restrictions on

20  committee membership, and (6) physical separation of units.  Herzel & Colling, 34 Bus.

21  Law at 88 – 91.  The article places special emphasis on the need for a policy statement.

22  Id. at 88. LeSieur's declaration does not state that any of these strategies have been used

23  at Unum.  Crucially, her declaration does not describe any policy statement setting out a

24  commitment by Unum's top management that claims should be adjudicated fairly

25  regardless of their impact on Unum's finances.  Consequently, the factors set out in

26  LeSieur's declaration do not lead the Court to find that the structural conflict of interest

27  is relatively unimportant in this case.

28

1
2

**C.      Unum Acted Illogically and Irrationally by Failing to Apply Dr. Ortiz'
R&Ls in its Vocational Review**

3       14.      Unum initially denied plaintiff benefits on the basis of a vocational review
4  conducted on February 28, 2011.  (750 – 769).  The vocational reviewer acknowledged
5  that she was using the R&Ls submitted by Dr. Ortiz for purposes of the vocational
6  review.  (750).  However, the reviewer does not acknowledge the fact that under Dr.
7  Ortiz' R&Ls, plaintiff is unable to sit "continuously" (for over two-thirds of a work
8  interval), but instead can only sit "frequently" (between one-third and two-thirds of a
9  work interval).  (Compare 737, 750).  Additionally, the reviewer does not give a reason
10  for not using Dr. Ortiz' sitting limitation.  Therefore, it was illogical for the reviewer not
11  to consider Dr. Ortiz' sitting limitation despite accepting her other R&Ls.

12       15.      Consequently, the vocational reviewer did not consider whether plaintiff's
13  sitting restriction would prevent her from performing any of the three alternative jobs.
14  Moreover, it appears that this illogical error caused the vocational reviewer to reach an
15  incorrect result.  The reviewer described each of the three occupations as "sedentary,"
16  and noted that "sedentary work involves sitting most of the time, but may involve
17  walking or standing for brief periods of time."  (753 – 754).  Since plaintiff could only
18  sit between one-third and two-thirds of a work interval, she would not be able to perform
19  work that requires sitting for most of the day.  Additionally, even if the reviewer had
20  considered the sitting limitation, it would have been unreasonable for the reviewer to
21  conclude that plaintiff was capable of performing a "sedentary" occupation without
22  determining precisely how long plaintiff was able to sit each day, i.e. whether she could
23  sit for an interval closer to one-third of a work period or closer to two-thirds of a work
24  period.

25       16.      The February 28, 2011 vocational review by Unum contains another
26  significant problem.  Although the vocational reviewer acknowledged that Dr. Ortiz'
27  R&Ls only allowed plaintiff to engage in "bilateral fine finger movements"

28

1    occasionally, the reviewer did not consider what fingering requirements any of the

2    alternative occupations imposed.  The failure to consider the fingering requirements of

3    the alternative occupations is notable because Unum had already concluded that plaintiff

4    could not perform her own occupation due to its fingering demands.

5          17.    Consequently, Unum's vocational review was illogical, and failed to

6    develop facts material to the review involving plaintiff's sitting capacity and the

7    alternative occupations' fingering requirements.  Therefore, Unum's initial decision to

8    terminate her benefits was an abuse of discretion.

9          **D.    Unum Acted Illogically When its Appellate Division Affirmed its**

10               **Termination of Benefits**

11         18.    In the course of evaluating plaintiff's appeal, Unum conducted a new

12   appellate vocational review to determine whether plaintiff was capable of performing the

13   alternative occupations.  (950).  Based on the review's conclusion that plaintiff was

14   capable of performing the alternative occupations, Unum affirmed its decision to deny

15   plaintiff benefits.  (956).

16         19.    In the course of its review, Unum determined that Dr. Ortiz' updated R&Ls

17   were not supported by medical evidence, but nonetheless concluded that her original

18   January 25, 2011 R&Ls were reasonable.  (956).  Unum did not, however, use Dr. Ortiz'

19   January 25, 2011 R&Ls when conducting its appellate vocational review.  Instead,

20   Unum utilized new R&Ls provided by its paper review physician Dr. Moses.  (913 –

21   914, 950).  These R&Ls provide that plaintiff "can perform full-time activity with

22   sedentary capacity."  (914).

23         20.    Therefore, Dr. Moses' R&Ls appear to effectively reject Dr. Ortiz' sitting

24   limitation.  However, Dr. Moses never justified rejecting the sitting limitation.  Instead,

25   Dr. Moses stated that he "basically" agreed with Dr. Ortiz' original R&Ls, and Dr.

26   Benson, Unum's other review physician, also noted that Dr. Ortiz' original R&Ls were

27   "reasonable."  (913, 946).

28

1      21.     When Unum conducted its appellate vocational review, it set out Dr.

2   Moses' R&Ls, and concluded that plaintiff could perform the alternative occupations,

3   even though "[t]hese occupations are primarily performed in a seated posture." (951).

4   However, since Unum never gave a reason for abandoning Dr. Ortiz' sitting restriction,

5   its failure to consider that restriction in its appellate vocational review was illogical.

6   Moreover, for the reasons explained above, it would have been irrational for Unum to

7   conclude that plaintiff could have performed the alternative occupations despite the

8   sitting restriction.  (Conclusions of Law, supra, ¶¶ 14 – 17).

9      22.     Consequently, the Court concludes that Unum acted illogically when it

10  affirmed its termination of plaintiff's benefits, and therefore also finds that its decision to

11  affirm the denial of benefits was an abuse of discretion.

12           **E.     Unum Failed to Consider Psychological Evidence**

13     23.     The reasons set out directly above show that Unum abused its discretion

14  when it terminated plaintiff's disability benefits.  Here, the Court briefly discusses other

15  evidence in the record that supports reviewing Unum's decision with enhanced

16  skepticism.

17     24.     While evaluating plaintiff's appeal, Unum and its reviewing physician Dr.

18  Moses stated that they would not consider plaintiff's psychological condition.  The

19  reason Unum gave for refusing to consider this evidence was that plaintiff had already

20  been paid the maximum allowed benefits for disabilities primarily due to mental illness.

21  (924, 957).  Therefore, Unum appears to have assumed that the provision in the Policy

22  limiting the availability of benefits for disabilities primarily due to mental illness also

23  operated to limit the evidence that could be considered when evaluating a disability

24  primarily due to physical condition.  This assumption is plainly unfounded.  The fact that

25  Unum had no obligation under the policy to cover a disability primarily due to mental

26  illness provides no reason to fail to consider relevant psychological evidence when

27  evaluating the capabilities of a claimant with a disability primarily due to physical

28

1  conditions.  See Perryman v. Provident Life and Accident Ins. Co., 690 F.Supp.2d 917,

2  955 (D. Ariz. 2010) (finding that an analogous limit on benefits for disabilities caused by

3  mental illness was inapplicable to mental impairments that are secondary to a physical

4  impairment).

5        25.    Such an unfounded interpretation of the Policy terms provides a reason to

6  give Unum's structural conflict of interest extra weight in this case.  Stephan, 617 F.3d

7  at 936.

8        26.    Additionally, because Unum took the position that evidence of plaintiff's

9  psychological condition was irrelevant under the policy, Unum's reviewing physicians

10  likely did not consider all relevant evidence.  (See 924, letter from Dr. Moses to Dr.

11  Ortiz ("Ms. Mondolo has already met her maximum for her mental and nervous portion

12  of her policy.  Therefore, we must only consider her physical impairments when

13  evaluating her functional abilities.")).  Because it appears that Unum's paper review

14  physicians did not consider all relevant aspects of plaintiff's health due to Unum's

15  flawed interpretation of the Policy, Unum's choice to conduct a pure paper review

16  "raises questions about the thoroughness and accuracy of the benefits determination."

17  Montour, 588 F.3d at 634.[3]

18        27.    To the extent necessary, each of these conclusions of law may be deemed to

19  be a finding of fact.

20  **IV.  CONCLUSIONS**

21      Based on the above Findings of Fact and Conclusions of Law, the Court finds that

22  Unum abused its discretion in terminating Ms. Mondolo's disability benefits.  Thus, the

23  Court finds in favor of Plaintiff, reinstates her to the Plan, and awards her retroactive

24

25

26      [3] Additionally, every physician who personally examined plaintiff concluded that she
was disabled and could not work.  Only paper reviewers disagreed with this conclusion.

27  This provides another reason to find that Unum's decision was unreasonable.  Salomaa v.

28  Honda Long Term Disability Plan, 642 F.3d 666, 676 (9th Cir. 2011).

1  benefits, plus interest, from the date her benefits were terminated to the date of this

2  Order.  Further, Plaintiff may make a motion for attorneys' fees and costs.

3        IT IS SO ORDERED.

4  Dated: January 16, 2013

5

6  _____

7                        CHRISTINA A. SNYDER
                         United States District Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17